One year due to your attention G's Johnny. First, please. Thank you, students and graduates and to- let's work. Before we begin, I would like to ask John Sun to please proceed. Before I do that I will add a couple of remarks from eight I'm trying to stick with your plan. Counsel for Mr. Zellberer-Fidings and Mr. Zellberer-Fidings himself will split the time, all right? And if you want to rebuttal it, that would be done by a counsel from Mr. Zellberer-Fidings, not by Mr. Zellberer-Fidings. You can't have any- Oh, okay, yeah. And just that, that reminded me that in certain circumstances it's historically easier to- that three minutes means three minutes. So when the light goes off, when the red light goes on, that is our- Great, so we will begin and I say we're going to begin Good morning. May it please the Court. Benjamin Daniels on behalf of Alfred Cattino. In this case, a pro se defendant provided evidence of three misstatements and or omissions in the wiretap affidavit against him. The government has admitted to two of them and they were incendiary. They suggested a far greater and sophisticated conspiracy than actually existed and cast doubt on the entire affidavit. When that's coupled with the boilerplate statements that the government used to justify this most intrusive of searches and the ubiquity of wiretaps in the District of Connecticut, this shows that the wiretap affidavits were deficient and shows why the District Court should have granted a Franks hearing or in the alternative suppressed the wiretap for a lack of necessity. The access cards paragraph in the affidavit dealt only with money laundering though, right? I'm sorry, could you repeat that? The Tim Hortons paragraph you challenged? Yes. About getting access cards for money laundering. That's what it was about, supposedly. I know you say it's not true and I admit it's not true, but how does that shift doubt on the drug conspiracy? Well, Your Honor, the Tim Hortons conspiracy that was in the affidavit was suggested an international money laundering conspiracy and as we said, it is false and the agent got the information from a pen register and he had used three phone calls from that pen register in order to deduce that that was a call to Tim Hortons and in fact, it was for a company called Flex Seal. There was no phone calls to Tim Hortons at all. No gift cards, none of that. And from that, he deduced that there was a, based on his experience, an international money laundering scheme. That is reckless and it's also material because a money... The question is how does that affect the drug conspiracy? How do you say that, you know, it somehow subtracts from the probable cause for the wiretaps related to the drug conspiracy? Well, what we believe is that the... including a money laundering conspiracy of that magnitude elevates this from a normal street-level drug conspiracy to a much more sophisticated and vast drug conspiracy than would ordinarily be believed and that would suggest to the reviewing judge, Judge Haight in this case, that this conspiracy necessitated a wiretap much more than it actually did. So that's why we believe that and wiretap suggesting a money laundering conspiracy in a drug conspiracy such as this would be kind of a unique situation and it was based on reckless misstatements by the reviewing, the affiant in this case, based on three pen register... I believe it's intercepted, Your Honor, in a different way. I don't have the mechanics of how precisely it's wiretapped but I believe that they tap into the cell network and are able to capture the phone calls in that manner. Right. Could I just ask you a procedural question, too, about this? One of your challenges, of course, is to the necessity. Right. And there's no record of the original motion to suppress ruling but there is one of the reconsideration ruling by Judge Edginton. That's correct. And I didn't see anything in the reconsideration ruling dealing with necessity. Why is that? Your Honor, it was raised to Judge Edginton but he did not address it. And we believe that that was a defect in the court's opinion. And primarily we believe that that was a defect because necessity is the way that you have to overcome the statutory presumption against the issuance of wiretaps. And that was the United States v. Giordano. The Supreme Court held that there was a presumption against wiretaps. And in order to overcome that, you have to show specific need in this particular case.  the reason for that rule is to prevent the government from saying they need general allegations about classes of cases. You can't say, as the court in Ippolito and U.S. v. Robinson, the D.C. Circuit said, you can't just say this is a drug conspiracy and it's inherently difficult to investigate. Well, they did have instances where they discussed things at great length.  that they needed to address, Your Honor, and a lot of them, they used boilerplate language that was repeated from other affidavits in the District of Connecticut and are routinely used. Well, I agree, in the summary order, that's probably fine. However, there's a statute that requires a showing of specificity in this case. And the court in this court, in the United States v. Lila, said that generic explanations for the failure to use a traditional investigative technique is not enough. And the Seventh Circuit in Blackman actually went through a similar situation that we have here. And they said that informants had limited knowledge. That's kind of the explanation that we have here. They said C.I.s were drug... that they couldn't use C.I.s because drug dealers know to keep things secret. That's what we have here. Pen registers don't ID callers. That's what we have here. And the Seventh Circuit held that that was not enough to show necessity. ...of why those aren't working. What would have worked here instead of using a way out? Well, traditional techniques were working, Your Honor. They used... ...attempted on numerous occasions. You can't get inside to watch what's going down in the house. That's one thing. This misography is leery of dealing with anybody who doesn't know.  with C.I.s and blockers and witnesses. What else should have been down here? Grand jury subpoenas. We all know grand jury subpoenas. Everything dries up. That covers a few of the investigative bases. So what was left that they couldn't use? Well, we believe that they were using cooperating witnesses to a good extent. And the only reason they felt that the cooperating witnesses were not good enough is because they couldn't uncover the entire conspiracy or the whole conspiracy. And that kind of language is not sufficient in this case because the data didn't show particularly in this case why that would be true. And that would be generic to every drug investigation. And furthermore, going back to the Franks issue, this entire affidavit is infected with at least three statements or omissions that have caused doubt on this affidavit. So when you couple those together, you have a failure to grant a Franks hearing in this case and a lack of necessity even on the face of the affidavit. So for those reasons, we ask that you reverse and remand either for a Franks hearing or with orders to suppress the wiretap. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Mr. Richards, Mr. Daniels, Mr. Glasser, Mr. Zoverfides. I'm William Koch, Jr. Your Honors, and I represent Mr. Zoverfides. The main thrust of my argument is that we're asking the Court to reverse Mr. Zoverfides' conviction, which was based on his guilty plea, because of a defect in the plea canvass and or that Mr. Zoverfides' motion to withdraw his plea should have been granted. I filed . . . The plea agreement, what I understand is that it wasn't adequately explained to the defendant that he might suffer removal? Yes. Yes, Your Honor, yes. The plea agreement says the removal would be presumptively mandatory and the district court went over that and explained it to him and he had to assume that he would be subject to that. How's that not adequately explaining it to the defendant? Well, if the plea agreement can supersede a Rule 11 canvass, then the government may have a stronger argument, but I'm not sure that it should, Your Honor. And I think that . . . Well, what was wrong about what Judge Meyer said to him? I think what happened here is that I filed the brief for Mr. Zoverfides in November of 2016. In June of 2017, the United States Supreme Court decided Lee v. The United States, which I know the Court is familiar with. And it's our view that that helps our argument and it also changes, or should change, federal law as far as the plea canvass goes when it's a federal narcotics drug trafficking offense and when it's a legal resident alien. In other words . . . Mr. Conner, if I could give you what I understand and you can either change . . . Okay, the Court. Okay, you are a U.S. citizen. No, I'm not, Your Honor. The Court. Well, very likely, since you're not a U.S. citizen, you could be subject to deportation or removal from the United States. You'd be denied citizenship, denied admission, etc. You understand that. I understand what they say, Your Honor, but I'm more American than anybody else. I love my country. The Court. You should assume for purposes of today you're going to face that kind of procedure. The defendant. I understand that, Your Honor. I know that, Your Honor. What more should the judge rely on? I think after the Lee case, and this isn't going to apply to state court cases or state court convictions, because that's a whole other area and this Court's decision . . . Okay. I think it should say this. Has your attorney told you that if you plead guilty to this Federal narcotics trafficking crime, deportation is mandatory? And then ask the lawyer, did you tell Mr. Zoverfidis that if you plead guilty to this Federal narcotics trafficking offense, deportation is mandatory? Because that's what Lee says. It says deportation is mandatory. It doesn't say you may be subject, you . . . And I think that . . . I understand that, Your Honor. I think that should be changed. I think after Lee . . . But that's not enough. That's . . . I think that's the essence of my argument. And I think that just like in a district court the judge asks, have you gone over the guidelines with your client? Yes. You know the guidelines he may have advised you, he or she may have advised you about that. He or she may not be right. The court should say, you are . . . Deportation is mandatory. Did your lawyer tell you that? If not, I'm telling you that, that deportation is mandatory. You enter this plea, you've got to understand deportation is mandatory. Does that change your decision on whether you should plead or not? That's what happened in the Lee case. Mr. Lee said . . .  Then his lawyer told him it was, you know, whatever. You're not going to get deported. So I think when you look at the totality of the facts and you look at my brief, the situation here . . . Our request should be granted because we never really knew what was said. If you go on in the brief when Judge Meyers asked Mr. Zografidis' lawyer if he had discussed the situation with him, he said, yeah, we've discussed it a lot because it's very important to him. The judge didn't ask, well, did you tell him that deportation is mandatory? Right, and then Mr. . . . But I think he went on to say, I'll have to deal with that if I ever face one of those . . . if I ever have to face that proceeding. I think there was . . . Well, I wasn't there, but . . . I mean, yes, I think they . . . Pretty sure, yeah. No, no, no. Yes, Your Honor. Deportation is mandatory. That's specifically what the Supreme Court says. Yes. Thank you. Thank you, Honorable Judges. In regards to deportation, I want to say one thing, that I was misinformed by Attorney Frank O'Reilly when I asked him, am I going to be deported? He goes to me, no, you will not be deported because you've been in this country for 40-some years, and you worked all your life, and your family is here. And I took that under consideration. And when Judge Myers asked me, he didn't make it clear to me. Nobody did make it clear to me that I would be deported if I signed that guilty plea. I want to make sure that this Court has full knowledge of what I said. I was misinformed. I found out that I would be deported after I pleaded guilty, and I did some research inside the White detention facility, and my inmates, they told me, look at this case, you will be deported. I said, no, I'm not. They said, yes, you will. And that's when I started getting furious, and I went against Frank O'Reilly, and I wanted to withdraw my guilty plea and go back and have further hearings. Now, as far as what I'm hearing today, Honorable Judges, I want to show this Court today as how A.U. Vanessa Richards knowingly, willingly, recklessly, with an ill intent, lied to a district court, and how fraudulent the government's Exhibit 15-TR is. In this exhibit, on December 22, 2015, during a status conference meeting in the presence of Honorable Judge Myers, A.U. Vanessa Richards, and A.U. Michael Ronowitz both produced and claimed that the entirety of Exhibit 15-TR is a meeting conversation captured and recorded by fitting a wire on CW No. 3, also known as Demetrius Kirpides, during a drug transaction dated on January 26, 2012, as it was documented in TFO Donovan Cicero's sworn affidavit. Now, Honorable Judges, before you make a decision, I want you to take a look at Document No. 1363. It's a pro se motion that I filed to the District Court of Connecticut after I was sentenced. And look at the three exhibits that I have. As a matter of fact, in that document, I have a sworn notarized affidavit by Mr. Demetrius Kirpides,  Under oath, he's saying that she never wore a wire under any circumstances, nor did he have any knowledge that she would be recorded. And she also asked me to tell this Court and Judge Meyers, which I did, that she wants to be subpoenaed back to the United States to testify under oath in support of his notarized sworn affidavit. So what we have here, we have recorded conversations that our government used as evidence against me. Yes, sir. Okay. Okay. The first argument. Hey, my buddy arrived just now. I'm on your street. I'm on your street. I'm just outside. Outside. Outside. Yes, in the front. Yes, in the front. Where are you? That is a phone conversation as toll analysis shows. A 22-second toll that was a phone call. And over here, she says it's a meeting. And it was shortcutted to a 10-second conversation with drawing my voice taken out to make it look as if it was a meeting conversation. Please also look at document number 1412, which is a lab analysis by an expert telling in conclusion that, sir, okay, those things, those two things, document number 1363 and document number 1412 which self-explanatory what happened with the white tax. We have a violation of my Fourth Amendment over here, I apologize. Illegally driving to my phone. That's what I want. Thank you, sir. Thank you, gentlemen. Thank you. May it please the Court, my name is Vanessa Richards and I'm here to represent the government in this appeal. Through the course of a fairly extensive wiretap applications beginning in February and extending in through April, the government established that Mr. Cattino and Mr. Zucker Friedas were part of a large-scale drug trafficking organization in the District of Connecticut but they were using cellular phones in furtherance of that drug trafficking. Contrary to the statements made by my colleagues from the defense side, this was not a street-level, common street-level drug organization. Mr. Cattino and Demetrius Jimmy Papadakis ran this drug trafficking organization. These two men had extensive criminal histories and federal convictions for drug trafficking. They were sophisticated drug traffickers. Mr. Cattino, by his own admission, is the last living member of the French Connection. He has spent more than half of his life in federal and French prisons for drug trafficking. As a consequence of their extensive drug trafficking background, they had a great deal of operational security. They were aware of how the police intercepted phones. They were aware of the rate at which those wiretap applications can happen. That, in fact, is borne out by the simple history of Mr. Cattino changing phones virtually every 30 days. I believe that is in the wiretap applications. This operational security is what limited the ability of the investigation to infiltrate the higher echelons of the organization, to determine who the sources of supply were to this organization. The sources of supply that were bringing in hundreds of grams of cocaine, thousands of oxycodone pills from New York, from Florida, from a state in between, and additionally, Mr. Zografritis's efforts to ultimately try and negotiate a 200-pound marijuana transfer from California to Connecticut. In terms of necessity, I want to say that the applications detailed a long-term investigation up to that point. The Norwalk Police Department, in connection with the Drug Enforcement Administration, had been investigating this operation for several months at the time that it was decided that a wiretap application would be appropriate. They had exhausted the limits of their cooperating witnesses, all of whom, none of whom, frankly, and you need to look really no further than this, none of them knew Mr. Cattino. What do you do when there's no record of the district court on a motion suppressed? What do you do with that? So that, in part, is why when this issue was raised in a motion for reconsideration, frankly, after Mr. Cattino had pled guilty. So Mr. Cattino pleads guilty, then raises a motion to reconsider on this point. That is the point at which the government said, you know what, Your Honor, I think you should reopen this. Because we went to look for the transcript and we were told by the court reporter it didn't exist. And so at that point the government essentially was reiterating its arguments as it always has with respect really to the Franks issue, which was that even if you accept as true the omissions and the misrepresentations that counsel was alleging, it doesn't defeat probable cause. With respect to necessity, Your Honor, I know you raised the issue that there was nothing in the motion or rather in the decision to address necessity. What I can say about that is I think that in the motion for reconsideration there was a primary focus by Mr. Cattino on Franks. He had never independently moved on necessity. He had joined the motions of his co-defendant Dominic Rubastello. And his motion for reconsideration really focused on this Franks issue. That, I think, is partially why Judge Edgington was addressing the motion for reconsideration on that point. With respect to not writing on necessity, I think just simply in light of the overwhelming case law on this subject, case law which, by the way, was reiterated by this circuit as recently as Thursday in the United States versus Tang Yuck, that where the government has established that they have gone through pretty much every investigative step and can detail why it fails in this particular instance or why just as a matter of common sense it would fail, such as transitioning a covert operation to an overt operation by notifying targets, that the government has satisfied necessity. And in light of the extensive nature of those affidavits, I don't know that Judge Edgington felt the need, frankly, to write on it. So what I would say is that, given the record, which, again, all of these items are in the record, all of Mr. Rubistello's motions are in the record, your honors can look at them and determine for yourself whether or not Judge Haight abused his discretion in granting these wiretaps. The government takes the position that he most definitely did not. This was, again, a situation in which the government had tried pretty much every investigative means it could to get into this organization, again, at the upper echelon. With respect to the Franks issue, what I will say is that while there were errors in these affidavits and the government owns those errors and takes responsibility for them, none of them vitiate the probable cause in this case. None of them, none of them take away from the multiple controlled purchases that were made into this organization. There were, I believe, eight or nine controlled purchases in total to Mr. Zografritis and his co-defendant, John Uranides. They were never genuinely contested in any way. No one ever came forth and said, oh, those never happened. Those controlled purchases never happened. Rather, there's an argument that was being presented that essentially more people engaged in those controlled purchases than were represented by the government. And again, I don't think that that vitiates the probable cause determination. With respect to Mr. Zografritis and his guilty plea, the plea agreement in this case, as Your Honors pointed out, was very explicit about the fact that this was a presumptively mandatory case of deportation in light of his conviction. I would note that Judge Meyer specifically addressed that issue in terms of determining that Mr. Zografritis had actually read and understood that plea agreement, and that's at Government's Appendix 33 through 34. So not only did Judge Meyer go to great lengths to talk to him in the colloquy about the fact that it was going to be presumed that this was going to happen and he should prepare himself for that, but the plea agreement itself stated that in the exact explicit terms that Mr. Koch wants it to be expressed. And Mr. Zografritis acknowledged that he had read that and understood it. I will say, additionally, this issue was vetted in a motion to withdraw his plea. Mr. Zografritis took the stand. He was cross-examined. Judge Edgington had an opportunity to see him in person and make credibility determinations about what he understood and when he understood it. Did he make such a determination? He ended up on the record denying the motion. Now, I'll grant you. He didn't say I don't believe you. That's true, Your Honor. Should he have? Does he need to? I don't think that he needs to. I think that he can listen to would it have been better form potentially to have set forth that record? Sure. He didn't. I don't think that that amounts to an abusive discretion. And I don't think it means that Mr. Zografritis's rights were     of the plea in terms of it being knowing and voluntary. I don't think that Mr. Zografritis would have said I don't believe you. So, Your Honor, with respect to a denial of Frank's hearing, the standard appears to be abusive discretion. But, essentially, and again, that was one of the issues that came up in this recent case of the United States v. Tanyuk. Prior to that point, I think there had been some question about it. But I think in that case, several of your colleagues made the determination that abusive discretion was appropriate. So, with respect to that, I will say, I think that that's an appropriate, I will say just in terms of articulating a reason for why that's an appropriate standard. Again, it's really for the determination about, well, does this, do I feel like I need more information about this? Have we reached a threshold with respect to this issue? And I think that Judge O'Shaughnessy did that in this case and reached a determination that he didn't need more information with respect to this issue. So, again, Your Honor, I think that the appropriate forum for Mr. Zoghafreed is in   we stand    know what forms of discretion are appropriate for Mr. Zoghafreed in this case. So, I think what Frank O'Reilly would say with respect to what he told Mr. Zoghafreed is, in a 2255, we would have that opportunity. And so, I think that is the most appropriate forum for this to proceed. And he's not, certainly, should you decide to not grant his appeal on this issue, he would not be precluded from raising that issue collaterally, which, again, would be the more appropriate place to do that. So, Your Honors, I want to, unless Your Honors have additional questions, just end on the notion that while I think defense counsel has articulated at least a picture that this was government overreach in some way, shape, or form, when you take a step back and you actually look at the facts and circumstances of this case, and you actually look at what the government was attempting to accomplish and did accomplish in this case, I think it's unquestionable that there was no government overreach. The government acted within the parameters of the Fourth Amendment and the Wiretap Act, and acted appropriately. Additionally, the government acted appropriately with respect to accepting the defendant Zoghafreidis' plea, and he was properly informed of the deportation implication of that plea by both the government and Judge Meier. Thank you, Your Honor. I did       think that's all I have to say about the court. I don't have any questions for you, Your Honor. I would just like to correct the record on one point. My colleague here said that Mr. Catino didn't raise the necessity argument on his motion to reconsider. I direct you to page JA1126. He raised it pretty clearly in which he cites the Lila case and Mr. Rubastello's argument there and incorporates it by reference. To the extent that the court is troubled by the fact that Judge Edgington didn't address the necessity requirement, that is a troubling situation. We would suggest that you could either decide it in the first instance here, whether the judge could articulate the reasons why they decided not to do the necessity in this     under the Frank's issue, that Judge Edgington decide the  they decided     case,   troubling situation.  suggest that you could decide the reasons why they decided not to do the necessity in this case, that is a troubling situation. Thank you. Not withstanding the plea agreement which said presumptively mandatory, it's important because it's important to society. Deportation is an important issue. I think the district court needs to say to the court that if you plead guilty to this, deportation is mandatory. That's it. Thank  Thank you all. We will observe decision on this. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. We've got people across the field here, so you're reaching out in the bubble. Thank you, Your Honor. May it please the Court, I'm Paul Wagner. I represent the City of Ithaca and the City Defendants, which are a number of individual chiefs and other employees. I was trial counsel at all three trials below, as well as the arbitration, which lasted 17 days over the course of two and a half years and resulted in the arbitration award, which you see in the record. The 2012 retaliation verdict in this case is precisely what the U.S. Supreme Court warned would happen under a lesser standard for causation. As Justice Kennedy wrote in Nassar, quote, if respondent were to prevail in his arguments here, that claim could be established by a lessened causation standard, all in order to prevent the undesired change in employment circumstances, end quote. That's it. Is the charge correct at the time it was given? It was not inconsistent, Your Honor, with the prevailing law in the circuit. There was some conflict. The Madama v. Chelley case, which we cite in our brief, seemed to suggest, did not come right out and say that a but-for causation standard would be appropriate in retaliation cases. But there was other law of the circuit that, which Judge McAvoy, our first district court judge, relied upon to give that instruction. And notably, when you compare that instruction, which in part he called at least in part because of protected activity, we would argue that even fell below the substantial and motivating factor standard that this Court has held to be plainly erroneous in the Zhao case, which was a retroactive application of the Nassar decision. And we understand that our colleague on the plaintiff's side has pointed out that that's not for presidential effect, but the Matsui case certainly is from the circuit that clearly indicates that a Supreme Court law shall be applied retroactively in any case on direct appeal. Correct. And has always been. And one more thing, Your Honor, with all due respect, and shall be applied retroactively on any case on direct appeal. Nassar came down between the first trial and the second trial. We notified the Court about it. You know, right. And despite the lack of presidential effect in Zhao and the related Kasoto case, this Court has in fact done so with respect to Nassar, with respect to a very similar and even stronger, frankly, I don't think so, Your Honor, if I may explore that. Why not? Absolutely. Judgment as a matter of law, and here's why. If you read the arbitration award, I don't suggest you haven't, this isn't your typical labor arbitration at a municipal level that might be a paragraph or even one word. This is a 53-page decision by Thomas Maroney, who heard over 40 witnesses and made very specific findings of fact. Those findings of fact, we argue, render this case such that no reasonable jury in this circuit or anywhere in this country could find that the but-for causation for the June 1 notice of discipline, which obviously led to his termination and produced the arbitration award, was retaliation. And if you look at Tom Maroney's findings in that arbitration award, he found, and by the way, clear and convincing evidence on page 43 and page 45 of the decision, he said, no, it's even beyond clear and convincing. That's the standard set forth in the CBA. What about the Rule 50 and 59 decisions by the District Court, too, the post-trial motion decisions? He concluded that it could never satisfy a but-for standard. What are we to make of that? That's a tough one, because... It's kind of like a summary judgment decision. Precisely, yet then he goes on to grant a new trial on liability on the Beats claim, even though he had decided under the Burlington Northern standard that the facts as produced at trial did not rise to the level of an adverse employment action. But remember, we also... On the notice of termination, the but-for discipline claim, he did say that there's no way this was the only but-for cause that led to the retaliation, that there were other reasons, too. But that sounds like a summary judgment statement by the District Court. What do we do with a post-trial decision like that? I think you could do two things with it. You could either take Judge McAvoy's findings as set forth in that decision, and order, by the way, pre-NASA and pre-arbitration award, that's what's notable about that, and say that based on his factual findings, he should have granted judgment as a matter of law on the post-trial motions. It's entitled to collateral estoppel effect, both the ultimate award and the factual findings of the arbitrator. There is no question in this circuit under the Federal Arbitration Act, and by the way, this arbitration award was never challenged by anyone. The FAA prescribes limited but enumerated bases to challenge an arbitration award, and that was never done. And remember, the arbitration award led to this man's termination as a police officer, and a finding that he had engaged in perjury in the second degree by clear and convincing evidence standard. There's a whole host of other factual findings in the arbitration award, including crediting the testimony of the three chiefs as to how they discovered his prior treachery, the investigation that ensued, and the decision to bring the June 1, 2010 NOD. So if I'm right, if the city is correct that those findings are entitled to collateral estoppel effect, no jury could find, no reasonable jury could find that retaliation was but for the purpose of the arbitration award. It's in our opening brief, there's about a string site of about 32 cases, Your Honor, and I'm not aware of anything that suggests otherwise. Now certainly, if there are infirmities in the arbitration award, if there are infirmities in the evidence allowed to be submitted, if we had an arbitrator who was, you know, more of the storefront arbitrator, but Tom Maroney, former U.S. Attorney for the Northern District of New York, Attorney General of State of New York and Constitutional Law Professor at Syracuse, a very experienced labor arbitrator beyond those other legal credentials. And Judge Sharp, our second judge, second and third judge in the two trials after the first, specifically noted on the record the completeness and the care given by Arbitrator Maroney in the decision. And therefore, he allowed it to be used very sparingly, which is also interesting that if this Court were to remand, as opposed to granting summary judgment or judgment as a whole, we would hope that the Court would also instruct Judge Sharp that those arbitration findings, the ultimate award as well as the factual findings, would be entitled to full collateral estoppel effect and should be submitted entirely to the jury in Trial Number 4. Could I just ask about the Beetz reassignment claim? Yes, Your Honor. There was one officer who testified and seemed to suggest that that's an adverse employment action. What's your basis for arguing that it would not have qualified as an adverse employment action? Thank you. This was July and August of 2009, 13 Beetz. Our winters are tough, but our summers are beautiful in Ithaca. And these were two Beetz that this very officer, Miller, had volunteered for, sometimes for overtime and sometimes as a favor to another officer. When the Chiefs assigned him, instructed him to go do the very Beetz that he had volunteered for in the summertime, he said, aha, this is punishment, this is retaliation. It simply doesn't cross the Burlington Northern Standard. And I think the case of Rodas v. Tan of Farmington, which was appealed, sorry, affirmed by this court in 2014 involving another municipal worker in very similar circumstances as instructed, the change in assignments and schedule in that case that was found not to be adverse employment action under the Burlington Northern Standard were actually much more punitive subjectively to that plaintiff. And the court said it doesn't matter the subjective view of why the superiors might have been assigned in it, the question is the reasonable person standard, it was within his job description, he got the same pay, the same benefits, the same schedule, and this was a rotational Beetz. These weren't new Beetz. These were the same Beetz that officers, they're police officers, they've got to cover the city. But that also is subjective, Your Honor, and it goes to the same point. When my superiors assign it to me, it's onerous, but I volunteer for it for overtime, that makes no sense. It's pleasing to me, in fact, inviting the... Right. And what's interesting from the first trial, Judge McEvoy, similar to the June 1 NOD comments by Judge Droney, actually made the factual finding that these weren't sufficiently adverse under the Burlington Northern Standard, but he ordered a new trial on liability. Those two things are inconsistent. So we think that this Court can go all the way back to that order, that post-trial order, and say that was erroneous, that he should have granted judgment as a matter of law after the post-trial motions. Now, it is true, and this is a complicated sort of procedural morass, it is true that if Your Honor's granted a retroactive application of Nassar to vacate the retaliation verdict, judgment as a matter of law, as we've argued here, and not remanding it for that, then there is a retaliation verdict and damages award from the third trial that would stand if you did not disturb that decision by the second jury and the third jury. $20,000. And that's on the Beetz reassignment, right? Solely on the Beetz reassignment. And that was subject to a remitter after the second trial for $50,000. The plaintiff rejected it, and we went back, did a whole other trial for a week and a half, and the jury came back with 20,000. Thank you, Your Honors. May it please the Court, the trial testimony in the 2012 trial before Judge McEvoy specifically referenced that the walking Beetz were less desirable, that's a transcript at 428, humiliating transcript at 2607, less desirable at 1186, 1231, 1703, given out as punishment, that's trial transcript at 1589, 1703 through 1704, 1876, 2090, 2098, and numerous witnesses testified that the example that had been made out of the plaintiff was such that no one wanted to be the next Miller. They were fearful of speaking out, associating, or being seen to help him, that's at the transcript at 362, 363 through 366, 570, and so on. There is ample evidence before the first jury that the Beetz assignments were adverse. There's ample evidence that they were retaliatory. Now this retaliatory investigation that was conducted by the City of Ithaca Police Department was not launched until after my client received his right to sue letter in February of 2010. The lawsuit was filed on May 20th of 2010. The notice of discipline was served and filed against my client on June 1st of 2010. And so the complaint had been filed before the notice of discipline was issued. And with respect to the arbitration matter, I'm sorry? So you argued here for the arbitration determination that there was no cause for it. Right. In fact, when Judge McAvoy issued his post-trial decision, he relied on McKinnon. And if you read the last paragraph of that decision by the Supreme Court, what they acknowledge is the danger that an employer will undertake an investigation, an extensive investigation when they're brought to suit, in order to acquire this after-acquired evidence so that they can say, well, we would have anyway. And that brings me to the point that Mr. Wagner and the City of Ithaca and all the defendants raised no Mount Healthy affirmative defense. They didn't plead it. They didn't argue it. Never. No Price Waterhouse Hopkins defense was pled nor argued. I'm sorry? The Price Waterhouse, we would have made the same decision defense. He didn't argue it. He didn't plead it. The Mount Healthy defense, even though there was a Section 1983 First Amendment claim and custom policy and practice claim, there was no Mount Healthy defense pled or argued or raised in the post-trial motions. What happened was that Judge McAvoy interposed that defense for the city and included it in his decision in which he made the finding that he was going, and he made many factual findings. If you look at his decision, he made findings that, among other things, that the court finds that plaintiff engaged in sufficient misconduct such that the plaintiff would have been issued a notice of termination regardless. That was an issue before the jury. He substituted his judgment for the jury. He made a determination factually that the beats were not undesirable, that they were He made findings of fact that Mr. Miller intentionally omitted matters from his past employment application. That was disputed at trial. He also made a finding that Mr. Miller was terminated from Vinton, fiercely, fiercely disputed at trial before the jury. He made a factual finding that my client was guilty of falsifying documents on the DWI a claim that he had removed from the plaintiff, but then made a finding of fact in the post-trial decision. Judge McAvoy punished the plaintiff by vacating his emotional distress damages as excessive and finding and relying on unplugged same decision defense as a basis for denying the equitable relief. It wasn't until the reply to our application to have the notice of discipline withdrawn because now it's tainted. The jury has found it was retaliatory. And but for doesn't mean the only cause. But for means that it was a causing, a motivating factor. Essentially, not, I understand it gets, well, you're right, your honor, you can't, you can't do that. But the second trial applied the Nassar charge. So the Beetz claim during the second trial before the second jury, they found but for Mr. Miller's protected activity, he would not have been subjected to this reassignment. And the second trial was liability on the Beetz assignments claim and a retrial, so he bifurcated it on the damages on the notice of termination and the Beetz. They separated it, which again brings me back to the first verdict, which Mr. Wagner did not object to the verdict form or the charge, combined the damages for retaliation. Section 1981 retaliation was not charged to the jury, although it was pled, although it was argued. We asked for that charge, the judge had not included it even though he had told us that he would. He said it was too late. The section 1981 retaliation claim has the same standard with respect to what the jury found, that there was retaliation based upon protected conduct. If court here reinstates the section 1981 retaliation claim, Nassar's not a problem. But our position is that even if you apply Nassar, you still have to apply the standard about whether or not you would order a new trial, and then you get into the application about whether there was clear error, excuse me, whether there was the four points. Under the section 1981, whether or not he was retaliated against for opposing discrimination. So the elements are the same, and I believe that the standard is the same with the exception that under section 1981, it can be private conduct, right? So under section 1983, because there's the municipality, and then that gets into the First Amendment claim, which my time has run out, unless you have any questions. What I want you to do is reinstate the first jury verdict. I think that that's the fair thing to do. I think that that's what preserves the public trust in the jury system. You know, there was no affirmative defenses raised with respect to what was argued post-trial and then used by the district court. There was plenty of evidence concerning the severe emotional distress, medications, incontinence, anxiety attacks, post-traumatic stress disorder, there was plenty of medical evidence to support those awards. The fact that the court had used this substitution of their own judgment of the credibility of witnesses, which is also in the decision, I think it was overstepped. And I don't think that was appropriate for the tri-court to do. Thank you. Thank you very much. You've got, you've reserved some time for rebuttal. Mr. Wagner. Thank you, Your Honor. Just a few corrections of the record. My colleague mentioned that the second trial on the beats used the Nassar standard. While that is true, two important distinctions. Number one, Judge Sharp instructed the jury during the liability bifurcated stage that the city had already been found to have retaliated in another instance against the same plaintiff. We thought that was wrong. More importantly, the arbitration award was not usable. The judge ruled that the arbitration award, although entitled to the effect of a collateral estoppel, did not specifically relate to the beats, and he was trying to cut close to the bone and keep it narrow. No problem, but the point being that if this case is retried on the June 1 NOD retaliation claim, our perspective is the whole thing comes in, either by Your Honor's consideration on a summary judgment or judgment as a matter of law, or on remand. Another point, my colleague gave a chronology of how things had such temporal proximity such that retaliation could be presumed. Judge McEvoy, on summary judgment, threw out the retaliation claim that the NOD was a response to the lawsuit being filed on May 20th. We proved to his satisfaction that the chiefs did not know about the lawsuit because it wasn't served until they had already drafted the NOD. That was also the same finding by the arbitrator in the arbitration. Finally, this notion of a right to sue letter in February, everybody gets a right to sue letter that goes to the EEOC. The more dispositive date is the last human rights complaint was filed a year prior to the NOD, and after it was filed, Miller was severely disciplined for intentionally falsifying a stopped DWI log, so much so that the district attorney sent a letter to the police department that's in the record saying I will not use him in any active prosecution or future prosecution because of problems with his credibility. So here's a police department frustrated that they've got a serial liar on their hands. They discover that he lied to get his job ten years prior in the first place, all happening after he had filed his last of four, count them, four human rights complaints over a period of three and a half years. Why did they retaliate against him in 2010 when he'd been doing this since 2006 and they kept going through the process and defending themselves? And those were found to not be credible. Last point, the Weber versus City of New York case that we said in our brief, 973 F SUP 227. It's Judge Brody from the Eastern District. It's a very on-point decision with regard to this Court's ability to grant summary judgment or judgment as a matter of law under the Nassar SPOC 4 standard. That's obviously in a district court setting at summary judgment, but Judge Brody applied the Nassar standard and then juxtaposed it to a hearing officer's determination under the New York State education law that found that the plaintiff in that case had engaged in unprofessional conduct, poor performance and poor judgment, didn't agree with the City's request to terminate, only gave a 60-day suspension. But Judge Brody said no reasonable jury could find that retaliation with much greater temporal proximity. Thank you. Thank you, Mr. Wagner. Your red light's been on for quite a while. Thank you. Ms. Bausman. Yes, Your Honor. The judgment as a matter of law granted a new trial test that we cited in our brief is the U.S. versus Marcus, and that is whether or not there was error, whether the error was clear and obvious, meaning there would be no reasonable dispute, the error affected substantial rights, meaning there is reasonable probability affected the outcome, and that the error substantially or seriously affects the fairness, integrity or public perception of judicial proceedings. The first time that the defendants have argued that they get a new trial has been based on the court's rulings allowing evidence of disparate treatment has been in this appeal. And with respect to the McKennan site that I spoke of earlier, the concern that employers might undertake extensive background and extensive discovery into employees' background to resist claims is not insubstantial. It's not insubstantial. And that's exactly what happened here. There was nothing about anything about this man's application for employment until after he had received his right to sue letter. He had made these complaints. He had, and then there's the recording from May 7th of 2010 that he has the meeting, and they specifically raise his Division of Human Rights complaints, and they say, we'll take whatever action. You need to get gone. You need to leave. And the, with respect to the First Amendment claim that was first, that was dismissed, the standard under Connick that it is a matter of public concern if it can be fairly considered as relating to any matter of political, social, or other concern, you look at the content, the form, and the context, Sousa v. Roque, and that is as it is revealed by the whole record. There's no question that this is an important public issue with respect to discrimination on the basis of race within the City of Ithaca Police Department. In Soluco, the trial court was found to have overstepped the bounds and usurped the jury's function by judging credibility. That's what happened here. As Justice Marshall has said, in McDonald v. Santa Fe trial, misconduct may be a basis for discharge, but it is not a basis to discriminate or retaliate. There's been three juries, actually four if you count the bifurcated trial, that have made a finding that my client was subjected to retaliation on the basis of protected activity. Despite the vitriol as submitted by Mr. Wagner calling my client a liar, three juries found that he was not, and I would suggest that their opinion is far more controlling than that of defense counsel. Thank you, Your Honors. Thank you both. Thank you both. We'll reserve decision and get you a determination in due course. United States v. Rodriguez. Thank you. May it please the Court, counsel for the government, My name is Ezra Spilkey, and I'm representing the appellant, Anthony Rodriguez, who is before this Court challenging his sentence of 108 months because it was based on an erroneous finding that he committed the offense in connection with another crime, namely attempted murder. Based only on what the District Court observed in a surveillance video, the Court found that  Yes, Your Honor. Yes, the crime as charged and as pled guilty to was 922-G1, felony in possession of ammunition. Yes. Whatever happened to the notion that maybe he was going to be, was the attempted murder itself an oppression? No, Your Honor, it was not. Do you have any explanation for that? I want to quote it. Well, I agree with Your Honor, and I believe that the Bronx District Attorney is the proper venue for such a question. Mr. Rodriguez is basically being punished without the complete process of a trial and without being charged. The first notice that Mr. Rodriguez got that he was going to be, that he might be punished, that he faced punishment for attempted murder, was in the government's letter. That's correct, Your Honor. He is not. And you were going to say the government's letter, the Pimentel letter? The Pimentel letter. Yes, Your Honor. Thank you. I was searching for the word. Now, the district court's decision was based solely on video footage, which captured, without any sound, the appellant firing a weapon. Now, there's no dispute that he fired a weapon. There's no dispute that he brought the weapon to his vantage point where he shot. There's no dispute of many of the actions that he took before firing the shots. There's no dispute over how many shots he shot. So what is our, I guess, standard of review is the phrase I want when we review what it is that Judge Nathan determined. And it seems to me she laid out on a couple of pages of transcripts, I won't read them to you, but how she reached the determination that she reached. Now, Your Honor, we argue that the de novo standard holds here and the government... Because she made a determination as a matter of law that this set of undisputed facts... That's right, Your Honor. ...constituted adequate proof of a mental state that would support attempted first-degree murder? That's correct, Your Honor. And we filed a 28-J letter citing United States v. Haack, which Your Honor was on the panel for. We believe that that is completely analogous. That case dealt with... United States v. Haack dealt with the voluntariness of a confession. The district court viewed a video that captured audio as well. But the district court did not rely solely on the words spoken in that regard. It could have just relied on a transcript of the interaction between the suspect and the police officers. Rather, the district court, and then later on, this court, noted and observed what the demeanor was and what behavior, what the tenor of the conversation was. The behavior here was not just the firing of four shots. He was waiting for the car coming down the street. He came out in front of it, shot four shots at the windshield, calmly walked away, got on his cell phone, met up with a friend, and went into an apartment building. It sounds like it wasn't something where he was surprised or he reacted to violence directed at him. How can you not draw an inference that it was premeditated intent to kill under those circumstances? Well, Your Honor, we don't dispute that. Well, rather, there's no... We made no effort to show any justification that this was... that the shooting was done in the heat of passion or something like that, that there was any legal justification for it. Rather, we just simply can't tell. And the fact that... Can't tell what? Well, Your Honor, that what the intent was, what the specific intent was. Now... But that... For instance, the district court viewed the video and saw someone acting calmly. I saw someone acting... who was full of adrenaline and sort of pumped up. I didn't see someone who was... who could just go the very next moment and have a conversation with his mother, let's say. So we all saw very different things from the same video evidence. All right. We saw different things, and therefore, we each have a different view of what the facts are, and therefore, why don't we leave it to the district court to make a factual determination, which we then review for clear error? Because it's a... The district court came to an ultimate legal conclusion on a mental state, and the facts were... As in Hawk, we have the exact same... This court has the exact same material to look at as the... But the legal conclusion as to the mental state is still a factual determination, is it not? It is, Your Honor, but in the same way that... In the same way that voluntariness of a confession is, which was found in Hawk. The... We would have heard if we had audio. He didn't say anything. What would we have gained from an audio accompaniment to the video? Well, I'm not sure, Your Honor, but every other case, every case that the government cites and that the district court cited that had other evidence to show specific intent to kill,